We'll ask the Clerk to call the De La Pasqua House, please. Case, please. Thank you. 116-1238, Catherine De La Pasqua, which is 100 miles from the school district. Counsel, you may proceed. Thank you, Your Honor. May it please the Court. Catherine De La Pasqua has been a school teacher for the Respondent Park Ridge and Isles for 12 years. Catherine De La Pasqua begins every day working five classes in a row, English classes. For the first 25 minutes of each hour, she stands at a smart board on the computer and types. She's been engaged in repetitive typing for the Respondent for the 12 years. How do we know this? Well, we know it because Catherine De La Pasqua testified to it. We also know it because her supervisor signed two documents saying she continually and repetitively types. Mr. Martin typed two. It's interesting, this file, because Ms. De La Pasqua believes she has capital tunnel as a result of repetitive typing at work, and her reporter believes that she has capital tunnel from repetitive typing at work, which is Mr. Martin. And yet, here we are. Who do we have that does not believe that she has capital tunnel from repetitive typing at work? One person, Dr. Bender. Well, who's Dr. Vitullo? Dr. Vitullo is the surgeon. Okay. Did he not opine, he made it clear that she had a negative EMG and that her compliance or diagnostics tests were not supportive of capital tunnel syndrome. So wasn't that some evidence against the claim? That's interesting you say that because he also says the EMG could be a false negative, and in the surgical report, which is the ultimate proof, he says he performed a capital tunnel release. Yeah, but he also testified non-repetitive, non-forceful activities were not the type to cause or contribute to the development of upper extremity conditions, and as such found no causal relationship to her work. No, that's Dr. Bender. Dr. Bender, pardon me, not Vitullo. That's Dr. Bender. Dr. Patel said it could have been a cause. Dr. Bender said no. But Dr. Bender thinks she's an English teacher, and the interesting thing with Dr. Bender, and I know this court has seen Dr. Bender numerous times over the years, he wasn't given the signed document from Jo Martin, her supervisor, as to what her duties were. Mr. Martin signed two separate documents that said she engages in repetitive typing. Now, those documents were in existence because one of them is on a Cedric document, and Cedric, as the person inquired, as the entity that hired Bender, they didn't give him that. They also didn't give him the written job description. And so Bender often sustained that she's an English teacher, and using a laptop is not going to be enough to do it. Well, it's more than that. She's a typist. She testified to it, and her supervisor testified to it. And then we get to this issue of notice. Ms. Del Pasqua testified that she believes she gave notice to Mr. Hedrington. Mr. Hedrington came in, a respondent called him as a witness, and he first said, yeah, I don't remember that. And then on cross-examination, he said, you know, it's possible that she gave me notice and I didn't write it down unless she took it to the next level. I would not have raised it. You know, I would not have written it down. We then look at the commission decision, and it's really ironic, the commission decision, because the commission decision chastises the petitioner for the manifestation date, and the manifestation date that she chose, it says, she chose May 11, 2011. There is no medical record in there that supports May 11 as a manifestation date. Well, it's interesting that the commission, the professionals are chastising her for that, because if they had read the full record, they would have seen on page 71 of the transcript, we amended the application to May 2, 2011. And if you read the commission decision later on, it says, the May 2, 2011 records indicate that this is the first time clinically petitioner demonstrated the science of carpal tunnel syndrome. Well, can I ask you about that? Because there's things that trouble the commission that I'd like you to answer. According to the evidence, Dr. Lindemann diagnosed the claimant with bilateral carpal tunnel syndrome on February 21, 2011. Is that correct? Yes. You're referring to the May 2 date, and it says on May 2, 2011, she had an appointment with Dr. Gulich? Yes. Did this happen? Did the claimant answer no on the patient history form? She was asked if the injury was work-related, and she says no. At that stage, she's not aware of that. Well, didn't she talk to Dr. — wasn't she diagnosed months earlier, though, a couple months earlier? She's diagnosed with it, but the relation to the causation of the work is not necessarily there, number one. And number two, the case law is clear that when you get to a certain manifestation date, it can be your date of accident for purpose of the law, the Durand case and the Zion-Benton case. And so — I understand. But she answers no on the patient history, and she's doing all this typing. That's all she does, and she has no idea that it's work-related? Well, at that point, she doesn't necessarily know. Okay. But, I mean, you can see these are inconsistencies that the Commission could be troubled by. But the Commission went through the May 2 date. So then we look at the May 2 date. Why would you pick the May 2 date? Because that's the first time that the condition begins to fail, when she gets the injections. This Court is aware of these powerful criminal cases. The manifestation dates are repeated all over the place, all over the place. And so you look when the condition first begins to fail. And when does it first begin to fail? When she sees Gulick and she gets the injection, because she can't take the pain anymore. And the Supreme Court and this other Court have continually said, listen, we are not going to penalize a worker who continues to work through a condition and continues to work through pain. And that's exactly what's happening here. That's true. That's true. And then the second point is there's absolutely no analysis in the Commission regarding what prejudice there was for the respondent here. None. Zero. And that's what the statute requires, it says, to demonstrate some prejudice. Why not? Because you can't. Mr. Martin signed a document. He says, if you look at that document, it says, states are opinion and understanding of the incident in narrative form to teach and develop counterpunct of the bold risk of continually degrading and tightening of the job. Now, how do you come in here with a straight face and say we don't have a notice? When he signs this document. I mean, in all honesty, how do you do that? And so there's no analysis of the prejudice at the Commission level. And so then we come on to causation and accident argument. And all we have is vendor. And vendor's information. So you're saying Bytula doesn't support the Commission's decision at all? Bytula? No, he doesn't. He says it might be a cause, which is what the law requires. A cause. It doesn't call it a cause, approximate cause. It says a cause. And Bytula gives it. Okay. We're still going to go back and forth. He said she had a negative EMG and that her complaints or diagnostic tests are not supportive of carpal tunnel syndrome. And you're saying that that doesn't matter when he says they're not supportive. I am not saying it doesn't matter. But then we continue to work on the patient. And then he does the surgery. And what does he do, Justice? He does the surgery. He calls it a carpal tunnel release. Now, what do you do a carpal tunnel release for? Well, yeah, you have some inconsistencies there. Right. And then he also says the EMG can be a false negative, which we all know. The EMGs aren't. There are false negatives out there. I mean, the proof is in the pudding. We know these diagnostics are not 100 percent accurate. It's the same with an MRI or a CAT scan or anything like that. But when you flew in and you operate, you open them up and you see it. And he called it carpal tunnel. That's what he called it. Vendor doesn't have any of the information regarding what she does. They withheld the information regarding the repetitive typing part. And, moreover, the commission never addresses the fact that these are admissions. Now, I know what the argument is on the website. The argument is, well, Martin is not a doctor. So it can't be considered a full admission that she has carpal tunnel from repetitive typing. That's not what we're saying the admission is. We're saying the admission is that she engages in the repetitive activity. The vendor says she doesn't engage in it. And they withheld that from vendor. That's what the issue is. The employer thinks she has it. The employee thinks she has it. The only person that doesn't think she has it is vendor in a brief, whatever, in Section 12 exam last, and then he kicks out this reform. This is court. I don't think I'm remiss in saying Dr. Vendor is a frequent flyer in this court. He's in this court more than I am. He's all over these carpal tunnel cases. So why couldn't the commission believe that? Why couldn't the commission? So I'm not saying why couldn't they believe Vendor because I know where you want me to go. You want to say this is naked Arabia? All right. That's what we always go into. And I'm going to say they ignore the evidence because the admissions aren't in there. And vendor's report does not mention anything about Mr. Martin saying, listen, she engages in repetitive typing continually. It's there. He does it in two separate documents. And he says it's his opinion. It's his opinion. So that's what's with health and vendor. So vendor's opinion is woefully incomplete. And so you ask yourself, then, why doesn't health lack from vendor? Why didn't the center extend that to him? Why didn't they give him a full job description so he could have a sound opinion? They didn't do it. Well, that's what the basis is. And the commission makes no analysis of these admissions at all. I respectfully ask that I wait to reserve a couple of minutes to reply. You'll have five. Thank you. I respectfully ask the court would reverse the decision of the commission on the issue of nullness, on the issue of accident, on the issue of causal connection, on the issue of duplicity. Thank you. Thank you, counsel. Counsel may respond. Good morning. Good morning. My name is Erin Baker. I'm the attorney for the Park Ridge and Isles School District. In this case, the evidence is abundant to support the commission decision on the issues of accident causation and notice. Any of these issues alone would be determinative, but taken together, there's simply no question that the commission was right in the decision. Can you hone in on what I think is probably the strongest argument? He's going to say yes. We acknowledge vendor. We acknowledge his testimony. But obviously his testimony is flawed. The foundation for his opinion is flawed because he did not have an accurate depiction or accurate information as to the amount of work she did. They ignored it every day. They ignored it. Is this Martin, an employer? Is Martin the employer? Martin was the principal the year after Mr. Heatherty took over. So Martin's information, and he would know what the claimant was doing every day, never got to the expert, so his opinion is flawed. How do you respond to that? Well, my response to that is that, first of all, Martin was completing these accident reports January 2012, long after the alleged manifestation date. We all know that often when these accident reports are completed, that they're completed with information given to the employer by the employee. And I think that if the petitioner's attorney is going to argue that this means an admission by the employer of her work activities, then I think looking at her statements back in May when her issues were happening, that she was going to the doctor that she wrote on her patient intake form, that this is not work-related. I think that that can also be true. Well, he says that she doesn't know. She doesn't have to know. Many times the claimant has an answer for that. Many times the claimant doesn't really know it's work-related. And to go back to your question about Mr. Martin's statements, Mr. Martin is not a doctor. He is not in the position to determine causal relation. The petitioner did submit to an IMU with Dr. Vendor. Dr. Vendor was able to question her about her work activities, to learn about her work activities, and he found that they were not forceful, repetitive. Right. That's what he's trying to tie into. So let me ask you about that. They were not forceful. So he says that Vendor's opinion was that her activities were not repetitive and not forceful, but he didn't really have the full picture. So you're saying then, to counter that argument, Vendor did have the full picture because he asked the claimant about her activities. Is that what you're saying? Yes, and he was providing medical records of all of her treatment that she's had to that date. And we also have her own doctor seeming to question whether or not this is actually work-related. Dr. Mottello, as you discussed earlier, said that this was, he said, and I quote, this is not a work-related injury in his narrative report. He did go on to say that there's a possibility that there could have been an aggravation of a preexisting condition. He only goes to a possibility, and so that's really not a very strong opinion to support her contention that this is related to her work. And to say it's not a strong opinion, is there an opinion? Well, he says, and I quote, this is not a work-related accident. So I think at best, Dr. Vendor's, or Dr. Katelda's opinion in his narrative report is quite inconsistent. And I think we have to look to Dr. Vendor, who reviewed everything and said there is no causation here. The work activities don't support this accident. And the diagnostic tests do not support finding a carpal tunnel in this case. And what was done to this lady? Excuse me? Who did what to this lady? Was there surgery? Dr. Mottello did a surgery later, which was a carpal tunnel release. Why would you do that if you didn't have it? Well, I go to Dr. Vendor who said that he didn't find that the surgery was required. The diagnostic test did not show. Now, who said she didn't have carpal tunnel? Dr. Vendor and Dr. Gillicks, both of the treatments that he mentioned did not show. Well, very simply, I guess I'm sorry. I keep trying to ask a question. I'm sorry to hear that. Okay. Okay. Who said she didn't have carpal tunnel? Dr. Vendor and Dr. Gillicks. Who did the surgery? Dr. Mottello. Was he just scamming a medical insurance system and putting it under a code? Or is it malpractice by a medical provider? What is that? I mean, it seems to me that it's strange. You do surgeries for things you say don't exist. I would not say it was malpractice. I'm not in a position to say that. Well, I didn't suggest that you should. But these are reasonable questions based on the inconsistency of Dr. Mottello. Sure. Which speaks louder, words or actions? Well, I suppose it depends on which opinion is found to be more persuasive. In this case, Dr. Vendor found that surgery was not required. The commission, reviewing all of the evidence, agreed with Dr. Vendor. Let me put it to you another way. Why would Dr. Vitello perform carpal tunnel release surgery on somebody who didn't have a carpal tunnel problem? Can you give us a logical explanation for that? Without going into any other things about Vendor's opinion, Vitello was on record as saying she didn't have it, yet he does an operation you've acknowledged. Why would he do an operation if she didn't have a carpal tunnel problem? You know, I can't get into why that is. So you really don't have an answer to your question. I think it's based on her continued subjective complaints and the lack of the conservative treatment resolving her subjective complaints. But I think this also leads to the issue of... So if somebody says I need my appendix out and the doctor says you don't, then the doctor should go ahead and take it out because the complainant thinks they should have the operation? Does that make any sense?  I think it was her ongoing complaints that led him to the surgery. But I think that this also goes to the issue of causation. So you just have ongoing side pain complaints? I mean, she had treated for wrist issues. We know that. There's also this issue, though, of the preexisting issues that were noted by the commission and that Dr. Vitello also noted in his narrative report, and that Dr. Bender also alluded to, showing that her issues dated back to 2009 in the medical records, long before she alleges any issue began at work, and that she also had prior wrist issues during her prior pregnancy. So these issues were preexisted when she alleges she first started noticing problems with her wrists at work. So that also shows inconsistencies with her testimony and with the medical records. Well, if she has a prior existing condition, does that matter? Well, it matters to show that it might not be related to her work. She's alleging that her issue began at work. But you don't deny that compensation can be awarded on an aggravation theory. Sure, but I doubt Dr. Vitello's opinion that this is not an aggravation theory. Let's go back to this. Your opposing counsel suggests that Bender doesn't have the full picture of what she actually is doing. What is it she's actually doing before the classroom begins? Well, she alleged that she uses a smart board where she types, and that projects what she's typing onto a screen. She also testified that she does that four days a week. She does not do that on the fifth day of the week when they do reading classes. And Dr. Bender's opinion was that typing is not enough of a repetitive, forceful activity to lead to the conditions that she's alleging. Typing is not forceful on her wrists, and that was the opinion that he found. I also want to quickly say... So typing... Okay, I may be misunderstood. I thought, did he talk about typing or did he talk about computers? Dr. Bender? Yes. He talked about computers. Okay, well, that's different, isn't it? Computers is different than typing? Oh, yeah, I'm an old person, so I remember when there were typewriters. There's keyboarding, there's typing, and there's computers. They don't all... They are not all equivalent, are they? Okay. I'm sorry, I don't follow. I know you... Typing on a computer... Yeah, forceful activity is with a keyboard often, okay, with a typewriter. It's clearly forceful activity, even with an electric, I suppose. Okay, well, I'm just curious as to what, you know, why one is... Closing counsel suggested one is forceful activity, and you're saying it's not. Well, she was not using a typewriter in this case. She was using a smart board, which is... What is a smart board? A smart board, in my understanding, and from what she described at trial, it's a computer, basically, that then projects onto a screen that she's able to type, and then her students are able to see what she's typing for her vocabulary. Absolutely. What about the keyboard, then? Is there a keyboard, separate keyboard? Yes, there would be a keyboard. A separate keyboard, so it's really a full keyboard. It's my understanding. So it's not a touch thing, a not-touch thing, or a keyboard on a touch thing? My understanding is it's a keyboard, yes. So it is actually a mechanical keyboard. Okay. Lastly, in terms of the issue of notice, though, what I think is really determinative here is that Ms. Zinopaska testified that she provided notice to Mr. Hetherington. Mr. Hetherington made clear at trial that he did not even work at the school district during the year that these issues were alleged to have occurred, and she alleged that towards the end of the year, spring, March to May, Mr. Hetherington worked there the year before. He alleged that he had no knowledge of her issues, of her, he never saw her wear a wrist brace, he never heard her discuss these issues at work. So I believe that she also failed to prove the issue of notice. The commission decision, I believe, should be affirmed. The commission should be given deference on resolving medical questions in this case of accident and petitioner similarly failed to prove notice. Thank you so much for your time tonight. Thank you, counsel. Excuse me. Thank you, counsel. Your Honors, a question to Dr. Venter. Please advise if you believe that her employment aggravated or accelerated her preexisting condition. And I'll come back to preexisting conditions in a moment. Ms. DelaPaz's work activities are that of an English teacher. This is a non-repetitive type of activity. It is not forceful. Stop. Right there. He says it's a non-repetitive activity. Martin says it's repetitive. He doesn't have any information. He thinks she's an old-fashioned English teacher. There's no mention of a smart board. There's no mention of a computer. Later on in his opinion, he refers to a laptop. Doesn't demonstrate any understanding of what she's doing all day, or not all day of the day, but for a large portion of her day that she testified to, her supervisor offered document support for. There's photographs in the record of her station where she shows the keyboard that she stands and she works at. The notice issue. She believed that she gave notice to Ed Venter. Her first complaints to a doctor are in February of 2011. Had Ed Venter worked there in 2010? As his court is aware, with carpal tunnel, it develops over time. So is it unthinkable or unreasonable that she may have had problems in 2010 and mentioned it to Ed Venter? Probably not. But if we take the commission, and the commission wants to say it's May 2, 2011, well, then Joe Martin's the supervisor, and Joe Martin signs the document and says he knows about it. So how can they with a straight face come in and argue notice in this situation? It just doesn't wash. This is a classic case of them trying to punish a person who works diligently through pain and then is forced to a situation of the pin the tail on the donkey with the manifestation date. It doesn't wash. It doesn't stand up. The last thing is this red herring of the pre-existing condition. Della Pasqua denied any pre-existing carpal tunnel. One of the doctors said they thought she had a joint pregnancy. The records are there for you to look at. Dr. Lindeman is her treating doctor, her family doctor, and goes back to, I think, 2002 or 2003. I looked through the records again last night. Zero mention of any carpal tunnel during her pregnancy. The last pregnancy is in 2008. Zero mention of any carpal tunnel. So I think that's obviously a red herring, but as the court pointed out, even if it was, an aggravation is compensable with the site. This is a wrong decision. It's incomplete. The commission didn't fully or fully understand the file. Defenders commission opinion without basis. And I respectfully request that this court overturn the decision on the issue of notice, causation, and accident. Thank you. Thank you, counsel, both for your arguments in this matter. You've taken under advisement. A written disposition shall issue. I will ask, are the attorneys for Mansell present? Okay. This will be our final case of the morning. And if the clerk would please call the case. 116-09-11. Joseph Mansell v. Kirk Vigil for inspection call. Very, very good. Before we begin. Everybody's here. Justice Hoffman had to leave. And I do want to announce for the record and for your information, counsel, that he is a fully participating member of this court and will be fully participating in the decision on this matter. He'll have the benefit of all of your oral arguments because they are being recorded. So with that being said, counsel may proceed. How was Ottawa this morning? It was beautiful. It obviously is. It was a nice drive out there, and I truly appreciate your letting me change the order, I guess. For future reference, there were no comp cases heard in Ottawa. No, there were not. I learned that firsthand. Chicago and Springfield only. And generally, Ottawa only hears third district cases. Right. I had been out there on a case last year, and we got this letter, and it was from the Ottawa office. That's because the presiding judge and the deputy clerk for our court is in Ottawa. That's the reason why. And I appreciate your understanding and my misunderstanding. Very good. You may proceed. Thank you. What we have is, at least in plain exposition, two main questions. One, which was determined by the arbitrator in favor of Mr. Mansell. Another, which was ruled against Mr. Mansell. The first was, was there any exposure to a hazardous chemical as defined under the Occupational Disease Act? The arbitrator determined that, based on what the Act states and the Freeman case, that any exposure to a chemical, whether, you know, how short or long or how much exposure, if there is a known hazard of working with that chemical, then exposure is determined to be, if he was exposed to any of those chemicals, the exposure is found in favor of the petitioner. You're saying if somebody is exposed to hazardous chemicals, he automatically wins the case? No, no, no, Your Honor. He showed that exposure, that he was, in fact, exposed under the Occupational Disease Act. I don't think anybody disputes that in this case. Do you think that he was exposed? The defendant argues that the arbitrator was incorrect in his application of Freeman and that there was no proof of how much exposure there actually was. Is there any definitive proof in this case as to how much exposure there actually was? There is not any definitive proof to how much part of it was. There's no objective way of measuring it, correct? Correct. After this exposure, there was a complaint to OSHA. OSHA came in and ran some tests to determine that there was, in fact, methylene chloride. The plaintiff testified that he handled. Well, let's not leave that hanging in the air because I believe, just because we'll get into it, OSHA did test, as you alluded to, and according to record, they found, or your claimant also acknowledged, OSHA found the levels of the substance was within what OSHA considers safe exposure. Is that correct? It was above the what's called actionable level, which was 12.5 parts per million, but below the long-term. OSHA regulations. Correct. But there was exposure. The plaintiff testified, in fact, that he was exposed to a number of chemicals and that at least one doctor, Dr. Orris, testified that that exposure was a cause of his current liver condition. The conclusion of this case is going to turn out, okay? You clearly have an opinion from a Dr. Orris in favor of the claimant. Correct. However, the commission found there were some very significant flaws in his opinion, which I think are significant I'd like you to address. Yes. First and foremost, Dr. Orris' information about claimant's length of employment was obviously way off. He had the claimant working and being exposed for 19 years, and when, in fact, it's clear that the claimant worked for the respondent for only 10 years. Is that correct? Correct. He testified for 10 years. So where did this nine-year discrepancy come in? That I'm not sure is either an incorrect history or an incorrect statement by the doctor. The commission also said Dr. Orris' inaccurate occupational history calls into question the basis for his opinion. He testified that the causes of claimant's liver abnormalities, which were multifactorial, admittedly, was one of the causes being exposure to the hydrocarbons, as you're alleging. Dr. Orris reached this conclusion based on his belief that the claimant left the job in spring 2003 and that his finding by October of 2003, the problems had resolved, claimant's liver had been reduced. Then we find out that his finding claimant's liver symptoms had been resolved was inaccurate. Claimant, in fact, sought treatment for multiple positions between August 21 and June 2010, and during this time he had a number of tests, blood work due to his complaints of liver and abdominal problems, and yet Orris thought they had resolved. Years before. How do you explain that? Right. I think Orris' opinion was based partially on that history, first of all, that he was released in 2003, and shortly after the CT scans showed that the fatty infiltration into the liver had subsided. I think there was, the commissioner pointed to one CT scan in 2005 that showed that there was more fatty infiltration in the liver than the 2003 one, and it put, it seems a lot of weight on that, saying that Dr. Orris' opinions are, I don't want to say incorrect, but, you know, based on the fact that he saw something in 2003 that showed the lessening of fatty liver infiltration. Yeah, but here's the problem. It undermines the basis for the opinion at least to this extent. The doctor says his problems have been resolved at this date, but this is the doctor's opinion that the exposure at the workplace was causing the man's problems. He then says it's resolved, and yet four years later he's still having these problems. It undermines his opinion, doesn't it? He's not being exposed for four years to these chemicals. Right. I don't know that he said it was resolved. I believe he said it was resolving. The objective findings on the CT scan show that they were resolving in 2003. In 2005 they showed that there was still some of the fatty liver, but I don't think he said it was resolved by 2003. I think he said it was resolving. And by 2008, when plaintiffs saw Dr. Muscarella and Dr. Joshi, there was absolutely no signs. And then by the time he saw Dr. Horace personally in 2010, he was completely asymptomatic, no signs. But I think Dr. Horace testified that, granted, he did rely on the history that was given to him, which was incorrect, but he also relied on all the medical records that he reviewed and testified to all the medical records he reviewed, which would include that 2005 CT scan that showed that, you know, some of those effects of the liver were actually still there in 2005, but also based on his extensive education and experience. He has a Harvard undergrad, a Yale master's degree. He has a doctorate, a board certified. And he testified based not just on the history. I think we all know that history is a very important factor in determining generally causation or diagnosis, but there are other factors. Again, looking at all the medical records, this doctor actually reviewed everything and testified that this chemical exposure was, in fact, a causative factor of the liver disease. You know, diabetes may have caused it too. However, the patient was never diagnosed with any liver issues before his start, before he started working. Was he diagnosed with diabetes before? He was not. He was not diagnosed with diabetes. He had no history of diabetes, no family history of diabetes, liver disease. So did he end up being diagnosed with diabetes? He did. He did. The doctor can't say that the diabetes was caused necessarily by the chemical exposure, but the diabetes and the chemical exposure, he testified, were both causes of the fatty liver infiltration. The NASH that he, the non-alcoholic, if I can have a second, the non-alcoholic steatotype hepatitis, which is basically inflammation of the liver caused by the infiltration of fat. There was no evidence to contradict that this chemical exposure was not a causative factor. Well, you don't, you'd have to prove this claim if you prove any other claim. Right. You can't say, as I said initially, he was exposed to this at some point, at some levels, which, albeit, you'd have to concede according to the testimony within OSHA standards, when they did the testing. So we can't fill in the gaps, can we, in the evidence? No, but that's where Dr. Boris' testimony, although, again, based on a slightly incorrect history, is also based on his review of all the medical records, which would include any testing done after his 2003 visit where, in October, where it showed that the liver was recovering after being outside of exposure for a few months. However, the plaintiff actually testified, and the medical records show that, subjectively, he said he was almost 100% better after being outside of the exposure for only a month and a half. He ended his... This is a claimant. This is a claimant. Right. Okay, so he's almost 100% better, and then he ends up, years later, he's still being treated. Wouldn't that indicate that the chemical exposure wasn't the source of his problem? Well, no. I would disagree with that based on, you know, the infiltration in the liver. Yeah, but he said he felt 100% better. At that visit, he was feeling better, yes, from being outside of the exposure. Then he leaves the employment, no exposure for four years, problems four years later. It doesn't undermine his case at all? I would say no, and, again, I would point to Dr. Horace, Dr. Joshi, Dr. Muscarella. Both Dr. Joshi and Dr. Muscarella, while they couldn't definitively state these chemicals were a causative factor, they felt confident enough not to send him back to that work because any exposure would... Why is he having problems? I guess I'm going to make you a very blunt question. Why is he having problems four years later when he has no exposure to the chemicals, and he said he was feeling 100% better a month later? Right. So what's causing his problems? Well, it's plain disposition that it's because of the continued long-term exposure before. Objectively, would it cause the damage to the liver? His subjective symptoms might wax and wane for a little bit, but eventually everything went away by 2008. There was no other... He had no other issues before he started working with these chemicals. He worked 40 hours a day, or 40 hours a week, at least, handling these chemicals, which, at least enough in chloride, the chemical that OSHA tested, in OSHA's documentation says it has the potential to cause, amongst other things, liver damage. We have a board-certified Harvard and Yale graduate who has basically 30 years' experience in public health and these kind of chemical exposures, and he has literature. He had literature from... What does he say? Right. It says that these chemicals can cause liver damage. That it is a possibility that they will cause liver damage? Exposure to these chemicals could cause liver damage, yes. Good. And what do we have here to establish that the liver problems your client has experienced was caused by that exposure? We have one, Dr. Orr's testimony. Two, a chain of events showing that there was no issues from before this. And what were the symptoms? I mean, all of this stuff is highly invasive diagnostic testing. Ultimately, it started as right flank pain. Right flank pain. Thought that these chemical exposures might be causing it, so he went to his supervisor and said, you know, I can't work with these chemicals. I'm going to see a doctor. That was the last time he worked, and these doctors did not want him to go back to working with these chemicals. So what do we have that's either... I mean, obviously, he has a symptom that developed while he was working. What links that symptom to his work? The exposure to the chemicals in the testimony of Dr. Orr's. No, I mean, you're obviously saying it's exposure, but what links him? What links him? His condition that he's experiencing to the work. Did Dr. Orr's testifying that this exposure to these chemicals from work that he handled every day caused or was a causative factor of the flank pain? Assume that the commission doesn't believe Dr. Orr's, which they didn't. Right. Is there anything else in the record that establishes a causal connection? Well, circumstantially, again, Dr. Joshi, Dr. Muscarella... Both of them said they couldn't opine. Right. Both of them also said that they did not want him to go back to that work because exposure... We understand that, but they both said they couldn't opine that there's a causal connection. Right. So if the commission disbelieves Orr's, then, of course, there is no opinion contained within the record that establishes causation. And in this particular case, the commission didn't find or the arbitrator didn't find there was no causal connection. The arbitrator found he failed to prove it. I mean, in this case, there's something a little bit unusual. We get these all the time, as you know, you, Roger, where there's conflicting medical evidence, and sometimes we question the commission's finding. They had very specific reasons why they didn't believe him. He had him exposed almost double to what the actual exposure was in terms of years, and he had the problem completely resolving itself, which would indicate when he stopped going to work it should have been okay, and years later he still has problems. So, I mean, they documented reasons why they rejected his opinion. Right. The exposure of 19 years, while, yes, it is almost double, the doctor doesn't state that he puts, you know, most of his... Yeah, but he maintains that's what he was told. That's what he based it on, the 19 years. Right. And that's part of his opinion. The rest of his... Other parts of his opinion, again, are his readings of the medical records, his education, his knowledge, and the fact that despite there being some objective findings of the liver after 2003 and 2005, the plaintiff's complaints were not anywhere near what they were at the time he was working, nor in the, you know, short time after he had left. Did the objective findings on the CT scan just show a little bit of this fatty liver infiltration? Counsel, your time is up. You'll have time, five minutes to reply. Thank you. Counsel, you may respond. Thank you. If it pleases the court, counsel, I'm marking the triangle for the respondent, Murphy Chemical. As was pointed out in counsel's argument, the commission went to some length five pages of single-spaced statements of facts, statement of facts, three single-spaced pages with regard to the causal connection issue. Who prepared that? Pardon? Who prepared that? The arbitrator's decision? Yeah. The arbitrator or one of the lawyers? Quite frankly, Your Honor, I don't know. I guess one of the lawyers. I didn't try the case. Because it's so pro-lix that the arbitrator probably wouldn't have had time to do it. It is. And I don't disagree. For my money, I don't need it much shorter, and here's why. Well, here, let's make it real easy. Oris's opinion is outcome-determinative, is it not? If they accept it, he recovers. If they reject it, he loses. There are no other opinions out there. If Your Honor is presenting me with an either-or? I just gave you a softball. Do you want to hit it out of the park? Correct. Okay. But as I said, I don't know that the commission had to go to such length. But it did. It did. And it rejected Oris. And once Oris's opinion is rejected, there is no opinion in the record, and the commission decided it on the failure of proof. Correct. That's it. And the commission has to reject Oris or to give his opinion less weight, an accumulative weight, of Drs. Joseph and Muscarella. And the fact that there was no opinion from Dr. Vente or this Dr. Oyama was involved, too, he said his condition is un-specified etiology. Dr. Muscarella initially said his condition, the fatty liver, could be purely a phenomenon of exogenous obesity, but he couldn't rule out this cause. That's not exactly the cause of connection. Dr. Joseph said that the etiology was obscure, wasn't clear. But you want to be careful of gilding the lead too much. I know you have a client to represent, but I think he just summarized your case. Oh, no. All I'm saying is the commission actually should have just looked at this evidence as opposed to Dr. Oris and decided that the way the evidence was, that there was no causal connection. Well, maybe they've been hearing from us in many cases, the approach that we take now is give us some reasons. Don't just say a conclusion. Document some factual findings. And here they did. So you should be happy with this. Well, I'm certainly not unhappy as I stand before the court. But all that I'm saying, I suspect I would have taken a little bit, if I were not a traitor to the commission, I would have taken a little bit more of a bare-bones approach. With the knowledge and understanding of what the court would like us to find. Well, you could snatch the feet out of the jaws of victory if you continue. Well, we have no intentions of doing that. All I can say is. Here, let's make it real easy. Instead of making everything so overly complicated. The commission said the question then becomes whether petition approved by preponderance of the credible evidence that a causal relationship exists between said exposure and the claimed occupational disease. Then they go on to say, after they go through Oris's opinion, however, Oris's opinion in this regard appears to be based in accurate history involving a cessation of workplace exposure. Thus, it would appear that Dr. Oris's attempt to relate petitioner's liver condition to the workplace exposure by pointing to the resolution of the findings immediately after removal from the source hazard is misplaced. Therefore, based upon the above, arbitrator finds petitioner failed to prove. So? Agreed. Did they have a right to reject Oris's opinion? Yes. And if so, why? They did because, not merely because of the manner in which they debunked Oris, but because they were the treating physicians. None of them could find a causal connection. They couldn't place weight on that. That's all I tried to say. Okay. And one other thing on the legal issues. My client and I believe that the commission's emphasis on Freeman was misplaced because Freeman was a new company. Why didn't he squeeze out his vote? Well, I think it's important that... To whom? To whom? To whom? Well, I guess at this point, Your Honor, it's not important at all. But we do reject the idea that merely because there was an exposure, there's a connection. They ended by saying, Instead, the arbitrary of this matter simply is a failure of proof in that the only opinion offered in support of a finding of causation in this matter, Dr. Oris was based on a significantly misunderstanding as to the duration and cessation of the workplace exposure. Accordingly, petitioner's claim for compensation is denied. No disagreement. And just one last point. Since we cited Sorensen here, I argued Sorensen. I'm surprised to see he was 20 years ago. And there we only had one doctor's opinion, and the court did not accept Dr. Burnett. Here we have many doctors saying no causal connection. No, no. The doctors didn't say no causal connection. Don't say that. They said we cannot relate it. We cannot relate it. And we cannot say that it is. They never said it wasn't. No disagreement, Your Honor. Okay. But again, that's not a causal connection. Thank you. Thank you, counsel. Counsel may reply. Just briefly, I think, again, while arbitrators are not required to take the testimony of Dr. Oris as gospel, you know, there is plaintiff argues that his opinion isn't solely based on this incorrect history. Again, he saw the plaintiff on two occasions. He reviewed medical up from shortly after the time of his last employment in August of 2001 up until 2008. And, again, he's basing this on his knowledge and understanding of the public health issues with these chemicals, as well as what the diagnoses were, the symptoms, the progression after the lapse of exposure to the chemicals, mainly the methylene chloride, which, again, was testified that he handled it 40 hours a day for 40 hours a week for 10 years. And while, again, Dr. Joshi and Dr. Moscarella do not state that they can relate the liver issues to these chemicals, again, the plaintiff feels that, circumstantially, their refusal of allowing him to return to this type of work. Well, maybe that's just good medical practice, too, isn't it? I would agree with that as well. But I think it does show that they at least had a concern. He had a concern, correct. You know, for the reasons stated, plaintiff asks that this court uphold the commissioner's decision that there was exposure under the act and reverse the finding that plaintiff failed to prove that there was a causal connection by the confidence of the evidence, as it is against the manifest within the evidence. Thank you. Thank you, counsel. Thank you, counsel, both, for your arguments. This matter will be taken under advisement. The disposition shall issue.